UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DENNIS CARTER,

                  Plaintiff,           Civil Action No. 21-12309

v.                             Laurie J. Michelson
                                United States District Judge

MICHAEL BOUCHARD, *et al.*,      David R. Grand
                                United States Magistrate Judge

                  Defendants.

_____/

## REPORT AND RECOMMENDATION TO GRANT DEFENDANTS' MOTION TO DISMISS AND FOR SUMMARY JUDGMENT (ECF No. 53)

## and

## ORDER DENYING DEFENDANTS' MOTION TO STRIKE (ECF No. 70)

On September 30, 2021, *pro se* plaintiff Dennis Carter ("Carter"), an incarcerated person, commenced this civil rights action pursuant to 42 U.S.C. § 1983 against Oakland County Sheriff Michael Bouchard and two employees of the Oakland County Jail, Deputies Jeff Jogan and Emily Hendrix (collectively "Defendants").[1]  (ECF No. 1).  In his complaint, Carter alleges that, while he was a pretrial detainee at the Oakland County Jail, Defendants failed to protect him from being assaulted by five other inmates, resulting in him being "seriously injured with multiple injuries[.]"  (*Id.*, PageID.2).

Now pending before the Court is a Motion to Dismiss and Motion for Summary

---

[1] This case has been referred to the undersigned for all pretrial purposes.  (ECF No. 11).

Judgment, which was filed by Defendants on December 16, 2022.  (ECF No. 53).  On March 28, 2023, Carter filed a response to Defendants' motion[2] (ECF No. 64), and Defendants filed a reply on April 4, 2023 (ECF No. 65).[3]

Generally, the Court will not hold a hearing on a motion in a civil case in which a party is in custody.  *See* E.D. Mich. LR 7.1(f).  Here, the Court finds that the facts and legal issues are adequately presented in the parties' briefs and on the record, and it declines to order a hearing at this time.

## I.    RECOMMENDATION

For the reasons set forth below, **IT IS RECOMMENDED** that Defendants' Motion to Dismiss or for Summary Judgment **(ECF No. 53)** be **GRANTED**.

## II.    REPORT

### A.    Factual Background

#### 1.    *Carter's Intake and Classification at the Oakland County Jail*

Carter was booked into the Oakland County Jail on July 5, 2018, on felony armed

---

[2] On January 5, 2023, the Court received a document from Carter, in which he indicated that he had not received a copy of Defendants' dispositive motion.  (ECF No. 57).  Because the copy of the motion mailed to Carter by Defendants was returned by the institution where Carter was confined, the Court extended Carter's deadline for responding to Defendants' dispositive motion. (ECF No. 61).  Thus, Carter's response was timely filed.

[3] Subsequently, on April 19, 2023, Carter filed a document captioned "Plaintiff's Response to Defendants' Reply to Clarify Issues."  (ECF No. 69).  Defendants moved to strike this filing, arguing that it violates E.D. Mich. LR 7.1(c)(3), which states that "a party must obtain leave of court to file more than one response to a motion for summary judgment." (ECF No. 70).  Although the Court recognizes that Carter's filing is an unauthorized sur-reply brief and could be stricken, given his *pro se* status, the Court will consider the filing's contents in ruling on the underlying motion.  Thus, **IT IS ORDERED** that Defendants' Motion to Strike Plaintiff's Response to Defendants' Reply to Clarify Issues **(ECF No. 70)** is **DENIED**.

robbery and home invasion charges, and he remained there as a pretrial detainee until October 19, 2021, when he was released into federal custody, where he remains today. (ECF No. 53, PageID.389-97).   According to Deputy Jogan's sworn affidavit, at all relevant times, Carter was designated by the Oakland County Jail's Classification Deputy as a Level 2 Maximum-Security inmate.  (*Id.*, PageID.402).   This is the second highest security risk classification within the Oakland County Jail.  (*Id.*).

In his affidavit, Deputy Jogan further avers that, while housed at the Oakland County Jail, Carter showed a propensity for violence toward other inmates on many occasions.  (*Id.*).   Carter had the reputation of being a "Rock Boss," i.e., a bully who repeatedly verbally threatened other inmates with violence.  (*Id.*).   Apparently, Carter used his size[4] to intimidate other inmates, and Deputy Jogan personally received frequent complaints from other inmates that Carter threatened to grab them through the bars of the cells.  (*Id.*).   Deputy Jogan often requested that Carter be removed from the cell block he was working for the safety of other inmates.  (*Id.*, PageID.403).

### 2.    *Carter's Interactions with Inmate Tony Richardson*

On April 24, 2021, Carter was housed on C-Block in a single-man cell, C303.[5]  (*Id.*, PageID.390).   Inmate Tony Richardson was housed on the same cell block.  (*Id.*,

---

[4] Medical records indicate that Carter is 6'4" tall and weighs 370 pounds.  (ECF No. 53, PageID.532).

[5] In the Oakland County Jail, inmates are housed on two floors.  (ECF No. 53, PageID.374-75). The first floor contains one cell block, I-Block.  (*Id.*).   The second floor contains five cell blocks: A, B, C, D, and K.  (*Id.*).   K-Block is considered a direct observation housing unit where there are 25 single man cells.  (*Id.*).   Blocks A, B, C, and D are each made up of five hallways, designated by number 1 through 5.  (*Id.*).   Hallways 1, 4, and 5 contain three 10-man cells (designated as A, B, and C), and hallways 2 and 3 have nine single-man cells and one isolation cell.  (*Id.*).

PageID.434).  At 1:42 a.m., Carter threatened to assault Richardson multiple times.  (*Id.*, PageID.437).  At 9:00 a.m., Carter submitted an Inmate Communication Kite[6] about Richardson allegedly having a homosexual relationship with another inmate.[7]  (*Id.*, PageID.439).  That same day, Richardson was separated from Carter and was transferred to A-Block (cell A306).  (*Id.*, PageID.434).  On May 5, 2021, however, Richardson was assigned back to C-Block (in a single-man cell, cell C302).  (*Id.*, PageID.434).  According to Deputy Jogan, Carter and Richardson were housed in adjacent cells for the next six days without any recorded incident.  (*Id.*, PageID.403).

On May 11, 2021, at 10:39 a.m., Carter wrote another kite about Richardson.[8]  (*Id.*, PageID.441).  Deputy Jogan received Carter's kite and then spoke with Carter in front of his cell.  (*Id.*, PageID.403).  Carter informed Deputy Jogan that he and Richardson had been involved in an altercation recently and that they were not supposed to be housed near each other.  (*Id.*).  According to Deputy Jogan, when Carter made this statement,

---

[6] A "kite" is an internal communication system used by inmates to communicate their needs in writing to deputies in electronic form.  (ECF No. 53, PageID.373).  As set forth herein, Carter clearly knew how to report any issues he had regarding his living conditions or safety within the jail, whether by verbal communication, kites, or through the formal grievance procedure.

[7] Specifically, Carter stated: "… cell 10 and cell 2 have a homosexual relationship going on and the reason yesterday why we was arguing is because cell 10 be attempting to have sex with cell 2 and i [sic] told them not around me they ain't that shit!  Can you please separate them or move cell 2 next to that so they can do they homosexual thing?  I been here real peaceful until these two tryed [sic] that stuff next to me!  I been here too long and never seen nothing like that!"  (ECF No. 53, PageID.439).

[8] This time, Carter said: "To Supr. Gilbert only!!!!  I have a major issue two weeks ago and you know the other confidential info about Tony Richardson, and you move him off the block separated from me!  Now some how he moves right back next door to me in cell two and that's a major situation!  Please act on this Supr. Gilbert because you know the facts on what's going on!  Thanks[.]"  (ECF No. 53, PageID.441).

Richardson was "housed within earshot in the cell next door ...." (*Id.*). Deputy Jogan checked the Incarceration Management and Cost Recovery System and found a written record of the April 24, 2021, incident where Carter and Richardson had been separated. (*Id.*). Deputy Jogan alerted the Classification Supervisor on duty, who decided that Richardson would be moved and notified Deputies Jogan and Hendrix accordingly.[9] (*Id.*). When Deputy Jogan told Richardson he was being moved, Richardson asked why, and Deputy Jogan "told him that Inmate Carter had informed [him] they weren't supposed to be housed together." (*Id.*, PageID.404). According to Deputy Jogan, Richardson "immediately went to the door and yelled 'It was cell 3' [i.e., Carter]." (*Id.*). Deputy Hendrix assisted in transporting Richardson to his new cell but had no discussion with Richardson about why he was being moved, nor did she have any further involvement in the matter. (*Id.*, PageID.443-44). Carter and Richardson were never housed together on the same cell block for the remainder of Carter's stay at the Oakland County Jail. (*Id.*, PageID.389-95, 432-35).

At 1:57 p.m. on May 11, 2021, Carter kited for the second time that day, this time accusing Deputy Hendrix of telling Richardson that Carter had kited him away from the cell block.[10] (*Id.*, PageID.447). At 2:40 p.m., Deputy Jogan responded to Carter's kite, saying: "Deputy Hendrix did not do this, I did, when inmate richardson asked why he was

---

[9] The undisputed evidence establishes that neither Deputy Jogan nor Deputy Hendrix had the authority to make housing assignment decisions. (ECF No. 53, PageID.403, 443).

[10] Specifically, Carter wrote: "To L.t i [sic] need to talk to you about ms. Hindrix [sic] misconduct please? Ms. Hindrix [sic] put my life in imminent danger, she told another inmate name tony Richardson that I wrote a kite on him and he yelled it out in the hall way to other in!ats [sic] that i [sic] wrote a kite on him to get him moved! This is unacceptable!" (ECF No. 53, PageID.447).

being moved, after removing him from the rock.  [M]y only mistake was that he was within yelling range of the rock still.  Jogan[.]"  (*Id.*).[11]  Carter claims that Deputy Jogan's actions resulted in him being viewed as a "rat" or a "snitch" within the Oakland County Jail.  (ECF No. 1, PageID.2).

After Carter and Richardson were separated, between May 12, 2021, and August 13, 2021, Carter repeatedly asked to be moved from a single-man cell into a multi-inmate cell (to be housed with up to nine other inmates).  (ECF No. 53, PageID.489, 491, 493, 495, 497).  On August 13, 2021, caseworker Jodi Barrigar considered Carter's most recent request to be moved "to a ten man out of the single man!" (*Id.*, PageID.495) and wrote:

> I met with [Carter] per his request to see me.  He reported that he would like to be moved to multiman housing.  He admitted that his stature and time her[e] can be intimidating to others and will be mindful of such.  He denied [any] thought disturbances, anxiety or depression. He wants more interaction and movem[e]nt. I spoke with Supervisor Maara, Classifications.   He was agreeable to move [Carter].

(*Id.*, PageID.497).   That same day, Carter was moved to multi-inmate cell D5B.  (*Id.*, PageID.389).

---

[11] In his unauthorized sur-reply, Carter claims that he filed a grievance and appeal pertaining to this situation, both of which were apparently responded to by Lieutenant Baldes.  (ECF No. 69, PageID.649-50).  Despite the fact that Defendants attached thirty exhibits to their dispositive motion, these documents were not provided to the Court, and, according to Carter, Lieutenant Baldes agreed – in responding to Carter's grievance and/or appeal – that Deputies Jogan and/or Hendrix "acted unprofessionally."  (*Id.*, PageID.650).  Carter asks that Defendants be ordered to provide copies of these documents to the Court.  (*Id.*, PageID.651).  But, even if Lieutenant Baldes believed that the individual defendants acted "unprofessionally," as Carter asserts, that is not evidence of a constitutional violation.  And, as explained in greater detail, *infra* at 14-17, Carter has not established a genuine issue of material fact with respect to his failure to protect claim.

### 3.   The August 30, 2021 Incident

For the next sixteen days, Carter was housed in cell D5B with inmate Antonio Fenn (and others) without incident.   (*Id.*, PageID.582).   According to Oakland County Jail records, between May 12, 2021, and August 30, 2021, there is no record of Carter communicating any safety concerns to Deputy Jogan, Deputy Hendrix, or Sheriff Bouchard.  (*Id.*, PageID.376).

On August 30, 2021, Deputy Kevin Chalmers heard yelling and responded to the area of cell D5B.  (*Id.*, PageID.499).   Deputy Chalmers observed Carter lying on the floor with an apparent injury to his lip.  (*Id.*).   He also observed inmate Antonio Fenn standing near Carter, yelling at him.  (*Id.*).   Deputy Hendrix responded to a radio transmission that there was a fight, but she arrived after the incident had taken place.  (*Id.*, PageID.444-45). She assisted in separating the inmates but did not take any formal statements.  (*Id.*, PageID.445).   Deputy Chalmers wrote up a formal report regarding the incident, after interviewing both Carter and Fenn.  (*Id.*, PageID.502-18).

When Carter was interviewed about the incident, he stated that he was just sitting on his bunk when inmate Fenn swung at him with his fists "for no reason."  (*Id.*, PageID.510).   According to Fenn, however, when he got out of the shower, he caught Carter reading through his paperwork; he confronted Carter, and they got into a verbal argument.  (*Id.*).   Fenn stated that he then threw a cleaning bottle at Carter, which led to the physical fight.  (*Id.*).   None of the records related to this incident – including Carter's own written statement (*Id.*, PageID.520) – make any reference to him being called a "rat" or a "snitch," nor do they suggest any connection between Fenn's alleged assault on Carter

and Carter's housing problems with Richardson more than three months earlier, in May 2021.

After the altercation, Carter was seen in the Oakland County Jail by Wellpath Nurse Samida, where he complained of pain in his shoulders and chest. (*Id.*, PageID.522-23). Carter was transported to McLaren Hospital, where he complained of a headache and was diagnosed with a forehead contusion and a laceration of his lip, for which he received two sutures and one 800mg tablet of ibuprofen. (*Id.*, PageID.534-35, 556). The next day, Carter was again seen in the Oakland County Jail by Wellpath Doctor Mitchell, who noted the contusion and sutures. (*Id.*, PageID.573). Carter's medical records are devoid of him voicing any complaints about his safety within the Oakland County Jail. When Carter was interviewed by Oakland County Jail Caseworker Phipps on August 31, 2021, the same was true; Carter said only that he had gotten into a fight and "wanted to go back to a 10 man cell." (*Id.*, PageID.575). And, when Caseworker Phipps followed up with Carter on September 14, 2021, Carter indicated that he "was okay with no major concerns at this time" and denied any cell issues or issues with others.[12] (*Id.*, PageID.579).

## B.   Standard of Review

### 1.   *Motion to Dismiss*

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) tests a complaint's legal sufficiency. Under Fed. R. Civ. P. 8(a)(2), a complaint must contain a "short and plain

---

[12] On September 14, 2021, Carter kited about Fenn, but again made no mention of allegedly being labeled a "rat" or a "snitch," nor did he reference his previous problems with Richardson. (ECF No. 53, PageID.577).

statement of the claim showing that the pleader is entitled to relief."  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  The plausibility standard "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]."  *Twombly*, 550 U.S. at 556.  Put another way, the complaint's allegations "must do more than create speculation or suspicion of a legally cognizable cause of action; they must show *entitlement* to relief." *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (emphasis in original) (citing *Twombly*, 550 U.S. at 555-56).

In deciding whether a plaintiff has set forth a "plausible" claim, a reviewing court must accept the factual allegations in the complaint as true.  *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  This tenet, however, "is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to prevent a complaint from being dismissed on grounds that it fails to sufficiently comport with basic pleading requirements.  *Iqbal*, 556 U.S. at 678; *see also Twombly*, 550 U.S. at 555; *Howard v. City of Girard, Ohio*, 346 F. App'x 49, 51 (6th Cir. 2009).  Furthermore, a court is not required to "create a claim which [a plaintiff] has not spelled out in his pleading[.]"  *Clark v. Nat'l Travelers Life Ins. Co.*, 518 F.2d 1167, 1169

9

(6th Cir. 1975).  Ultimately, "[d]etermining whether a complaint states a plausible claim for relief will … be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

### 2. Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56, the Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Pittman v. Cuyahoga Cnty. Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011).  A fact is material if it might affect the outcome of the case under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material fact exists, the Court assumes the truth of the non-moving party's evidence and construes all reasonable inferences from that evidence in the light most favorable to the non-moving party.  *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).

The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion and must identify particular portions of the record that demonstrate the absence of a genuine dispute as to any material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009).  "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'"  *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  In response to a summary judgment motion, the

opposing party may not rest on its pleadings, nor "'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Alexander*, 576 F.3d at 558 (internal quotations omitted).

### C.  Analysis

#### 1.  *Carter's Official Capacity Claim Against Sheriff Bouchard*

Carter's complaint seeks relief against Sheriff Bouchard in his official capacity. (ECF No. 1).  In § 1983 litigation, "[a]n official capacity claim filed against a public employee is equivalent to a lawsuit directed against the public entity which that agent represents."  *Claybrook v. Birchwell*, 199 F.3d 350, 355 n. 4 (6th Cir. 2000).  Because Carter's official capacity claim against Sheriff Bouchard is more accurately described as a claim against Oakland County itself, Carter must plead and prove a municipal liability claim under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

In order to establish liability under *Monell*, a plaintiff must identify the official policy or custom that caused his injury.  *See Ford v. County of Grand Traverse*, 535 F.3d 483, 495 (6th Cir. 2008).  Once the policy is identified, "a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Board of Cty. Comm'rs of Bryan Cty., Okla. v. Brown*, 520 U.S. 397, 404 (1997).

The Sixth Circuit has identified four ways in which a plaintiff may plead and prove that a municipality's policy, custom, or usage was the moving force behind the alleged constitutional violation: (1) the municipality's legislative enactments or official agency

11

policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations. *See Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). Here, Carter focuses on the third and fourth prongs, arguing that Sheriff Bouchard maintained a policy of inadequate training or supervision and a custom of tolerance or acquiescence of federal rights violations. (ECF No. 64, PageID.625-27). More specifically, Carter alleges that – due to a lack of proper training or supervision, or due to a custom of tolerating civil rights violations – there was an unwritten policy or custom permitting deputies to report to one inmate that another inmate "snitched" on him. (*Id.*, PageID.626).

Both of these theories of *Monell* liability against Sheriff Bouchard fall under the "inaction theory," as discussed in *Thomas*, where there is an allegation of a policy or custom of tolerating federal rights violations which is unwritten, but nevertheless entrenched. *See Thomas*, 398 F.3d at 429. To succeed on a municipal liability claim under an "inaction theory," a plaintiff must allege and establish: (1) the existence of a clear and persistent pattern of illegal activity; (2) notice or constructive notice on the part of the defendant; (3) the defendant's tacit approval of the unconstitutional conduct, such that his deliberate indifference in his failure to act can be said to amount to an official policy of inaction; and (4) that the defendant's custom was the "moving force" or direct causal link in the constitutional deprivation. *Id.* For each of these *Monell* theories of liability, Carter must allege prior instances of unconstitutional conduct demonstrating that Sheriff Bouchard was aware of and ignored constitutional violations similar to the ones at issue in

12

this case and, thus, was clearly on notice that training in this area was inadequate and likely to cause injury.  *See Slusher v. Carson*, 540 F.3d 449, 457 (6th Cir. 2008).  Carter clearly fails to satisfy those requirements.

Aside from Carter's conclusory allegations regarding this particular situation, he has failed to point to any facts that would justify the denial of summary judgment on his official capacity claim against Sheriff Bouchard.  Even if Carter is correct that Deputy Jogan "openly states that he personally informed inmate Tony Richardson that [Carter] told on Richardson," Deputy Jogan's actions *in this one particular instance* would not demonstrate the existence of a broader "unwritten policy or custom fomented by Oakland County Sheriff Michael Bouchard" to label inmates as "snitches," as Carter alleges.  (ECF No. 64, PageID.626-27).  In short, Carter has not "reach[ed] beyond the facts of this case to show any possibility of a pattern."  *Thomas*, 398 F.3d at 434.  Rather, he has only pled facts specific to *one* occurrence, and an alleged violation of constitutional rights *specific to him*. In such situations, where "the plaintiff has only his experience on which to rely and does not allege similar incidents involving others[,]" the Sixth Circuit has consistently affirmed lower courts' decisions to dismiss official capacity claims.  *See, e.g., Sanders v. City of Memphis, Tenn.*, No. 2:21-cv-02585-MSN-cgc, 2022 WL 4665867, at *3 (W.D. Tenn. Sept. 30, 2022) (internal quotations omitted) (citing *Shorts v. Bartholomew*, 255 F. App'x 46, 58 (6th Cir. 2007); *Nouri v. Cty. of Oakland*, 615 F. App'x 291, 296 (6th Cir. 2015) ("But we have never found notice of a pattern of misconduct (or the pattern itself) solely from the mistreatment of the plaintiff.").

13

Thus, where Carter has failed to allege prior instances of similar conduct, demonstrating that Sheriff Bouchard was aware of and ignored constitutional violations similar to the ones at issue in this case – and, therefore, was clearly on notice that Oakland County's training in this area was inadequate and likely to cause injury – Carter's official capacity claim against Sheriff Bouchard should be dismissed. *See Miller v. Calhoun Cty.*, 408 F.3d 803, 816 (6th Cir. 2005) (absent evidence of a "history of similar incidents" or notice, or evidence that the governmental entity's "failure to take meliorative action was deliberate," the plaintiff's claim of municipal liability under § 1983 fails).

### 2. *Carter's Deliberate Indifference Claim Against Deputies Jogan and Hendrix*

In his complaint, Carter also brings a § 1983 claim against Deputies Jogan and Hendrix for their alleged failure to protect him from the assault by inmate Fenn under a theory of deliberate indifference.[13] (ECF No. 1, PageID.2). At the time of his alleged injury, Carter was a pretrial detainee. Although the Sixth Circuit had historically analyzed Fourteenth Amendment pretrial detainee claims and Eighth Amendment prisoner claims under the same rubric, that court recently found that "applying the same analysis to these constitutionally distinct groups is no longer tenable." *Brawner v. Scott Cty., Tenn.*, 14 F. 4th 585, 596 (6th Cir. 2021). Now, a failure to protect claim brought by a pretrial detainee requires only an *objective* showing that the individual defendant acted (or failed to act)

---

[13] In his complaint, Carter also mentions "defamation," "slander," and a "deprivation of [his] rights of confidentiality." (ECF No. 1, PageID.2). However, there is no constitutional right of "confidentiality," nor has Carter alleged any facts that would form the basis for a claim of defamation or slander under § 1983. Thus, Carter's only § 1983 claim against Deputies Jogan and Hendrix is for deliberate indifference.

deliberately and recklessly. *Id.*  A pretrial detainee establishes deliberate indifference by proving "more than negligence but less than subjective intent – something akin to reckless disregard." *Id.* at 596-97 (internal quotations omitted).  A defendant must have acted deliberately (not accidentally) and recklessly "in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Id.* at 596 (internal quotations omitted).

Recently, in *Westmoreland v. Butler Cty.*, 29 F.4th 721 (6th Cir. 2022), the Sixth Circuit specifically applied this standard to a pretrial detainee's failure to protect claim against an individual officer, holding that, to meet the standard of "reckless disregard," the detainee must establish that: (1) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (2) those conditions put the plaintiff at substantial risk of suffering serious harm; (3) the defendant did not take reasonable available measures to abate that risk, even though a reasonable officer under the circumstances would have appreciated the high degree of risk involved – making the consequences of the defendant's conduct obvious; and (4) by not taking such measures, the defendant caused the plaintiff's injuries. *Id.* at 728-29.

In this case, viewing the record evidence in the light most favorable to Carter, the non-moving party, no genuine issue of material fact exists as to whether Deputy Jogan or Hendrix violated the Fourteenth Amendment by failing to protect him.  With respect to the first prong of the *Westmoreland* test, Carter appears to assert that it was Deputy Jogan's[14]

---

[14] While Carter's complaint makes a passing conclusory reference to Deputy Hendrix making the

action in disclosing to inmate Richardson, on May 11, 2021, that he was being moved to a different cell because Carter had said that he and Richardson were not supposed to be housed together that constitutes an intentional decision with respect to Carter's conditions of confinement.[15]  (ECF No. 64, PageID.627).  In his affidavit, Deputy Jogan concedes that he shared this fact with Richardson, and, at least arguably, Deputy Jogan should have known that doing so could put Carter at substantial risk of suffering serious harm.  This is particularly true if, as Carter asserts, this made him a "rat" or a "snitch" in "jailhouse lingo." (*Id.*).  And, Defendants have come forward with no evidence that Deputy Jogan took "reasonable available measures to abate that risk, even though a reasonable officer under the circumstances would have appreciated the high degree of risk involved[.]"

---

alleged wrongful disclosure along with Deputy Jogan, the record evidence establishes that Deputy Hendrix played no role in informing inmate Richardson why he was being moved on the day in question (ECF No. 53, PageID.444), and Carter seems to have abandoned the issue as to Deputy Hendrix.  Deputy Hendrix avers that, inmate "Richardson spoke to Deputy Jogan about his new housing unit," and that while she "assisted in transporting Inmate Richardson without issue," she "did not inform him why he was being moved."  (*Id.*).  In his response brief, Carter does not challenge Deputy Hendrix's averments.  To the contrary, Carter seems to agree that it was only Deputy Jogan who spoke with inmate Richardson about the reason for his move.  (ECF No. 64, PageID.626) ("Defendant Jeff Jogan specifically told inmate Tony Richardson that Plaintiff told on him . . .").  Because Carter has not shown that Deputy Hendrix made an intentional decision with respect to the conditions under which Carter was confined, he cannot succeed on his failure to protect claim against her.  Thus, summary judgment in favor of Deputy Hendrix should be granted for this reason alone, as well as for the other reasons discussed herein as to Deputy Jogan.

[15] In their motion, Defendants argue that the "intentional decision" first prong of the *Westmoreland* test is not satisfied because neither Deputy Jogan nor Deputy Hendrix had the authority to determine Carter's housing assignment, nor did they play any role in moving him to cell D5B, where he was eventually assaulted.  (ECF No. 53, PageID.365).  The evidence of record does in fact establish that this was the case, and, thus, the decision to move Carter cannot form the basis of a failure to protect claim.  However, Carter also alleges that Deputy Jogan's act of disclosing to inmate Richardson that he (Carter) had requested Richardson's transfer was an intentional decision that affected his conditions of confinement.  (ECF No. 64, PageID.627).  Thus, the Court must also consider this aspect of Deputy Jogan's conduct in evaluating Carter's failure to protect claim.

16

*Westmoreland*, 29 F.4th at 729.  Thus, viewing the facts in the light most favorable to Carter, he has established a genuine issue of material fact as to the first three prongs of the *Westmoreland* test.

The problem for Carter, however, is that he cannot satisfy *Westmoreland's* fourth prong because there simply is no evidence that Deputy Jogan's actions on May 11, 2021, *caused* the injuries he suffered at the hands of inmate Fenn more than three months later, on August 30, 2021.  First, causation is lacking because Deputy Jogan did not reassign Carter to cell D5B, where he ultimately was assaulted; rather, the evidence demonstrates that it was *Carter* who repeatedly, between May and August 2021, asked to be moved from a single-man cell into a multi-inmate cell (to be housed with up to nine other inmates). (ECF No. 53, PageID.489, 491, 493, 495, 497).[16]  Second, the period of time between Carter's move to a multi-inmate cell and the assault he suffered makes clear that he cannot show that Deputy Jogan's comments or the decision to move him caused his injuries.  *See, e.g., Galeski v. Ricumstrict*, No. CV 17-12495, 2019 WL 5800291, at *9-10 (E.D. Mich. July 31, 2019), report and recommendation adopted, No. CV 17-12495, 2019 WL 4409711 (E.D. Mich. Sept. 16, 2019), aff'd, No. 19-2128, 2020 WL 5822531 (6th Cir. June 30, 2020).  Again, Carter was transferred to the multi-inmate cell in D5B on August 13, 2021, and coexisted with his cellmates there without incident for sixteen days.  During this time, he never complained to anyone that he had been threatened or was concerned for his safety

---

[16] This certainly suggests that Carter did not believe he was at a substantial risk of serious harm, as a single-man cell would have been safer for him if he believed other inmates wished to harm him.

in that cell.  To that end, Deputy Jogan avers that, as of August 30, 2021, he had "no reason to believe Inmate Carter was at risk of suffering harm or injury from his cellmates or anyone else within the Oakland County Jail" (ECF No. 53, PageID.404), and Carter has come forward with no evidence suggesting otherwise.  Indeed, Carter's contemporaneous statement that he was punched by inmate Fenn "for no reason" (*Id.*, PageID.510), as well as inmate Fenn's statement that he attacked Carter because he caught Carter reading his personal paperwork (*id.*), are evidence that *Carter's own actions* were the cause of his injuries, or at least that Carter cannot show that Deputy Jogan's comments or the decision to move him caused his injuries.  Finally, Carter's statements to medical providers and caseworkers after the assault further demonstrate that he did not believe there was any connection between the assault and his months-old dispute with inmate Richardson.  (*Id.*, PageID.523, 534-35, 573, 575, 579).  At a minimum, the foregoing shows that Carter failed to a raise a material question of fact that Deputy Jogan's conduct on May 11, 2021, caused his injuries more than three months later on August 30, 2021.

For all of these reasons, Carter has not established a genuine issue of material fact that Deputy Jogan's actions on May 11, 2021, caused his injuries more than three months later on August 30, 2021.  Because Carter cannot satisfy the fourth prong of the *Westmoreland* test, summary judgment should be granted in favor of the individual defendants on Carter's failure to protect claim.

## III.   CONCLUSION

For the above reasons set forth above, **IT IS RECOMMENDED** that Defendants' Motion to Dismiss or for Summary Judgment **(ECF No. 53)** be **GRANTED** and that this

case be **DISMISSED** in its entirety and with prejudice.


Dated: June 13, 2023                               s/David R. Grand
Ann Arbor, Michigan                                DAVID R. GRAND
                                                   United States Magistrate Judge

## REVIEW

The parties to this action may object to and seek review of this Report and Recommendation and Order, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

*Note these additional requirements at the direction of Judge Michelson:*

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.  An objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on June 13, 2023.

<div style="margin-left: 40%">

sMarlena Williams_____
for EDDREY O. BUTTS
Case Manager

</div>